Mary CASH, Plaintiff–Appellant,

v.

**GRANVILLE COUNTY BOARD OF EDUCATION, Defendant– Appellee,**

North Carolina Association of Educators; American Civil Liberties Union of North Carolina Legal Foundation, Incorporated; North Carolina Academy of Trial Lawyers; North Carolina School Boards Association, Amici Curiae.

No. 00–1496.

United States Court of Appeals, Fourth Circuit.

Argued Dec. 6, 2000.

Decided March 1, 2001.

**ARGUED**: Susan Ashley Osment, McSurely & Osment, Chapel Hill, NC, for Appellant. Kenneth Alexander Soo, Tharrington Smith, L.L.P., Raleigh, NC, for Appellee. **ON BRIEF**: Lisa Lukasik, Tharrington Smith, L.L.P., Raleigh, NC, for Appellee. S. Luke Largess, Ferguson, Stein, Wallas, Adkins, Gresham & Sumter, P.A., Charlotte, NC, for Amicus Curiae Educators. Martha A. Geer, Patterson, Harkavy & Lawrence, L.L.P., Raleigh, NC, for Amici Curiae ACLU and Trial Lawyers. Allison B. Schafer, North Carolina School Boards Association, Raleigh, NC; Christopher Zemp Campbell, Roberts & Stevens, P.A., Asheville, NC, for Amicus Curiae School Boards.

Before NIEMEYER, MICHAEL, and MOTZ, Circuit Judges.

## OPINION

NIEMEYER, Circuit Judge:

We are required to determine in this case whether the Granville County (North Carolina) Board of Education enjoys Eleventh Amendment immunity in a suit brought by an employee against it under the Fair Labor Standards Act for overtime pay. The district court, finding that the Board was "an arm of the State" and that any monetary award "would affect the State," held the Board immune. Because we conclude, for the reasons that follow, that the Board is more like a county than an arm of the State, we reverse.

## I

Mary Cash has, since 1975, been employed as a "Lead Secretary/Bookkeeper (Secretary V)" at J.F. Webb High School in Oxford, North Carolina. She alleges that during the period between 1996 and 1999 she often worked more than 40 hours per week and was not compensated with overtime pay. She commenced this action against the Granville County Board of Education (sometimes "School Board") under the Fair Labor Standards Act, 29 U.S.C. §§ 201–219, to recover compensatory and liquidated damages, interest, costs, and attorneys fees.

The School Board asserted a defense of sovereign immunity under the Eleventh Amendment. On the School Board's motion for summary judgment, the district court dismissed the action. In doing so, the court assumed that *Harter v. Vernon*, 101 F.3d 334 (4th Cir.1996), our most recent opinion on whether particular governmental entities are "arms of the State" for Eleventh Amendment purposes, "is no longer salient and [was] effectively overruled" by *McMillian v. Monroe County*, 520 U.S. 781, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997), and *Regents of the University of California v. Doe*, 519 U.S. 425, 117 S.Ct. 900, 137 L.Ed.2d 55 (1997). The district court read *Regents'* requirement that an analysis of Eleventh Amendment immunity consider "the provisions of State law that define the agency's character" to be in conflict with *Harter's* holding that the "most important consideration is whether the State treasury will be affected." Similarly, it noted that the *McMillian* Court relied on "the character of the [sheriff's] office, rather than the impact of the judgment on the State treasury." [1] The district court then concluded:

the plaintiff could not sue the County as a person liable under 42 U.S.C. § 1983. *See* 520 U.S. at 783, 117 S.Ct. 1734. And in *Regents*, the Court held that the fact that a

---

1. In *McMillian*, the Supreme Court held that because the County Sheriff was acting, in the particular circumstances of the case, as a policymaker of the State and not the County,

Thus, while the question of funding and who would pay for any monetary award is not the central question to be answered in evaluating immunity, it must be evaluated. It is clear that local school boards receive funds from the state and local governments. However, the ability of local boards to use those funds remains controlled by the state. Thus, it appears that any monetary award to plaintiff would affect the state.

Therefore, combining an analysis of the organizational and financial structure of the local school boards, in light of relevant case and statutory law, defendant is an arm of the state of North Carolina for purposes of this suit seeking FLSA damages. As such, it is entitled to sovereign immunity from a suit for monetary relief.

From the district court's judgment dismissing her claim, Cash noticed this appeal.

## II

■■■ Even though the language of the Eleventh Amendment preserves sovereign immunity of only the *States* of the Union,[2] it is settled that this protection extends also to "state agents and state instrumentalities," *Regents*, 519 U.S. at 429, 117 S.Ct. 900 or stated otherwise, to "arm[s] of the State" and State officials, *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). But Eleventh Amendment immunity "does not extend to counties and similar municipal corporations." *Id.* This is so, even if the counties and municipalities exercise a "slice of State power." *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency*, 440 U.S. 391, 401, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979) (citing *Mt. Healthy*). In *Mt. Healthy*, the Su-

preme Court held that a local school board, as constituted by Ohio law, is "more like a county or city than it is like an arm of the State." 429 U.S. at 280, 97 S.Ct. 568. Accordingly, the Court denied the local school board Eleventh Amendment immunity.

■■■ The issue before us, as articulated by the Supreme Court, therefore turns on whether the Granville County Board of Education "is to be treated as an arm of the State partaking of the State's Eleventh Amendment immunity, or is instead to be treated as a municipal corporation or other political subdivision to which the Eleventh Amendment does not extend." *Mt. Healthy*, 429 U.S. at 280, 97 S.Ct. 568. Stated otherwise, we must determine whether a North Carolina county school board "has the same kind of independent status as a county or is instead an arm of the State, and therefore 'one of the United States' within the meaning of the Eleventh Amendment." *Regents*, 519 U.S. at 429 n. 5, 117 S.Ct. 900. Because this question requires interpretation of the Eleventh Amendment, it is a federal question that we decide *de novo*, even though State law must be considered in defining the School Board's "character." *See id.*

■■■ Before elucidating the factors necessary to resolve this question, it is worthwhile to recognize that the immunity in question derives from the original sovereignty of the states and not from the Eleventh Amendment. "The Eleventh Amendment confirmed, rather than established, sovereign immunity as a constitutional principle." *Alden v. Maine*, 527 U.S. 706, 728–29, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999). And, "it follows that the scope of the States' immunity from suit is demarcated not by the text of the Amendment

judgment against the State would be covered by the voluntary indemnification agreement of a third party did not strip away the State's Eleventh Amendment immunity because the State still bore the legal "risk of an adverse judgment." 519 U.S. at 431, 117 S.Ct. 900.

2. The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against *one of the United States* by Citizens of another State, or by Citizens or Subjects of any Foreign State." (Emphasis added).

alone but by fundamental postulates implicit in the constitutional design." *Id.* at 729, 119 S.Ct. 2240. That design reserves to States "a substantial portion of the Nation's primary sovereignty, together with the dignity and essential attributes inhering in that status," *id.* at 714, 119 S.Ct. 2240, and preserves "a system in which the State and Federal Governments would exercise concurrent authority over the people," *id.* (quoting *Printz v. United States,* 521 U.S. 898, 919–20, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997)). The States thus "retain the dignity, though not the full authority, of sovereignty." *Id.* at 715, 119 S.Ct. 2240. Central to the dignity of a State's sovereignty is the proposition that the State not be amenable to suit without its consent. At the time the federal Constitution was proposed, the fear expressed during the debates was that adoption of the new Constitution would strip States of their sovereign immunity, thereby exposing them to lawsuits for collection of Revolutionary War debts. *Id.* at 716–17, 119 S.Ct. 2240.

■ Even with a clear understanding of the source and nature of a State's sovereign immunity, no bright line of demarcation can be drawn separating "state agents and state instrumentalities," which partake of the State's Eleventh Amendment immunity, from local governmental entities, which do not. But when the factors for resolving whether a governmental entity is an arm of the State or more like a county or municipality point in different directions, our inquiry seeks guidance in the "twin reasons" for the Eleventh Amendment: (1) "the States' fears that 'federal courts would force them to pay their Revolutionary War debts, leading to their financial ruin,'" and (2) "the integrity retained by each State in our federal system," including the States' sovereign immunity from suit. *Hess v. Port Auth. Trans-Hudson Corp.,* 513 U.S. 30, 39, 115 S.Ct. 394, 130 L.Ed.2d 245 (1994) (quoting *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 151, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984)). Indeed, these twin reasons must "dominate" any analysis of whether a governmental entity is to be accorded Eleventh Amendment immunity. *See Gray v. Laws,* 51 F.3d 426, 432 (4th Cir.1995).

■ Consistent with the twin purposes of the Eleventh Amendment, when we have asked the question of whether a governmental entity within a State is an arm of the State, various factors have been identified for consideration. The principal factor, upon which courts have virtually always relied, is whether a judgment against the governmental entity would have to be paid from the State's treasury. *See Regents,* 519 U.S. at 430, 117 S.Ct. 900 (pointing out that "whether a money judgment against a state instrumentality or official would be enforceable against the State is of considerable importance"); *Hess,* 513 U.S. at 49, 115 S.Ct. 394 (agreeing with "the vast majority of Circuits" that "the State treasury factor is the most important factor to be considered" (internal quotation marks omitted)); *Harter v. Vernon,* 101 F.3d 334, 338 (4th Cir.1996) (noting that the "state treasury factor is the most important"); *Gray,* 51 F.3d at 434 (noting that the State treasury factor "is generally the most important consideration" (internal quotation marks omitted)); *Ram Ditta v. Maryland Nat'l Park & Planning Comm'n,* 822 F.2d 456, 457 (4th Cir.1987) (concluding that the State treasury factor generally is "most important consideration"). Indeed, it is because the State treasury factor may be dispositive that it is primary. Consequently, if the State treasury will be called upon to pay a judgment against a governmental entity, then Eleventh Amendment immunity applies to that entity, and consideration of any other factor becomes unnecessary. *See Hess,* 513 U.S. at 50, 115 S.Ct. 394 ("Where an agency is so structured that ... a judgment must expend itself against state treasuries, common sense and the rationale of the eleventh amendment require that sovereign immunity attach to the agency" (internal quotation marks

omitted)); *Harter,* 101 F.3d at 340 (holding that once the court concludes that the State's treasury is affected by a law suit, the officer or entity is immune); *Gray,* 51 F.3d at 434 (observing that if "the state's treasury will not be affected by a judgment in the action, then the availability of immunity ... must be determined by resort to the other relevant considerations" affecting the integrity retained by a State within the federal system); *Bockes v. Fields,* 999 F.2d 788, 791 (4th Cir.1993) ("When the action seeks damages that would be satisfied by state funds, however, no further inquiry is necessary").

 Because the State treasury factor is "the most salient factor in Eleventh Amendment determinations," *Hess,* 513 U.S. at 48, 115 S.Ct. 394, a finding that the State treasury will not be affected by a judgment against the governmental entity weighs against finding that entity immune. Nonetheless, the entity may still enjoy sovereign immunity if the judgment would adversely affect the dignity of the State as a sovereign and as one of the United States. To satisfy this further inquiry, the relationship between the governmental entity and the State must be sufficiently close to make the entity an arm of the State. Under this inquiry, factors formed largely to determine the "relationship between the State and the entity in question," *Regents,* 519 U.S. at 429, 117 S.Ct. 900, as well as "the nature of the entity created by state law," *Mt. Healthy,* 429 U.S. at 280, 97 S.Ct. 568, become relevant. To examine the nature of the entity and its relationship with the State, we keep the State treasury factor in the calculus and look to three additional factors: (1) the degree of control that the State exercises over the entity or the degree of autonomy from the State that the entity enjoys; (2) the scope of the entity's concerns—whether local or statewide—with which the entity is involved; and (3) the manner in which State law treats the entity. *See Harter,* 101 F.3d at 337; *Gray,* 51 F.3d at 434; *Ram Ditta,* 822 F.2d at 457–58. Un-

der this "sovereign dignity" inquiry, a court must, in the end, determine whether the governmental entity is so connected to the State that the legal action against the entity would, despite the fact that the judgment will not be paid from the State treasury, amount to "the indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties." *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 58, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) (internal quotation marks omitted); *see also Hess,* 513 U.S. at 39–40, 115 S.Ct. 394 (noting that Eleventh Amendment secures to the States "the respect" due them).

## III

With these principles in hand, we turn first to the question of whether a judgment in this case against the Granville County Board of Education will affect the North Carolina State treasury. Only if this question is answered in the negative do we proceed to inquire whether a judgment would otherwise affront the sovereign dignity of North Carolina by demeaning its right not to be sued without its consent. And this second inquiry raises the subsidiary question of whether, under North Carolina law, the School Board functions more like a county or municipality than like an arm of the State itself.

 The parties agree that the State would not be legally obligated to pay any judgment rendered against the School Board in this case. The School Board is a corporate entity that can sue and be sued, and no State law indicates that a judgment against it can be enforced against the State. *See* N.C. Gen.Stat. § 115C–40. Indeed, the School Board is unable to identify a provision in State law that would authorize it even to use, for the purposes of satisfying an adverse judgment, funds allocated by the State for specific educational purposes. Similarly, the School Board admits that the record "does not demonstrate that the State's allocation of funds would increase to cover a judgment

in a FLSA suit." The School Board's only argument on the State treasury factor is that Mary Cash's salary, which might be affected by a judgment in this case, might prospectively be the subject of "a specific annual state appropriation from the state's general fund." We find this effect too indirect and ancillary, however, because any such appropriation would be brought about by the State's obligation to comply with federal law. *See Alden,* 527 U.S. at 755, 119 S.Ct. 2240 (noting that Eleventh Amendment immunity does not include the "right to disregard . . . valid federal law"); *Edelman v. Jordan,* 415 U.S. 651, 667–68, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) (noting that when State officials, in order to comply with a decree of federal court, must spend State funds, the effect on the State treasury is "ancillary" and thus permissible). Moreover, even such an indirect and ancillary effect is not inevitable. The School Board itself could just as well supplement wages of noninstructional support personnel out of local funds. Indeed, under North Carolina law, counties have the power to raise funds on behalf of local school boards to enable them to discharge their duties, and local school boards are authorized to bring suit to enforce a county's obligation to raise funds. *See* N.C. Gen.Stat. § 115C–431. In addition, local school boards are authorized to spend their local funds for unforeseen emergencies with the approval of the county. *See id.* § 115C–433(d). The speculative, indirect, and ancillary impact on the State treasury that a judgment against the School Board in this case would have does not give rise to Eleventh Amendment protection.

Because the North Carolina treasury will not be affected by a judgment against the School Board in this case, the question of whether the School Board is entitled to Eleventh Amendment immunity will turn on whether Mary Cash's suit against the School Board would nonetheless impinge upon the sovereign dignity of North Carolina as a State within our federal system. This question may be resolved by consideration of the other three factors identified above, *see Gray,* 51 F.3d at 434, keeping in mind that the most important factor—"the vulnerability of the State's purse"—counsels against a finding of immunity. *Hess,* 513 U.S. at 48, 115 S.Ct. 394.

The first of these remaining factors addresses the degree of control that the State has over the Board and, correspondingly, the degree of autonomy exercised by the School Board. As the parties acknowledge, school boards in North Carolina are independent corporate bodies within each county that may sue and be sued, and, to respond to the risk of being sued, they are authorized to purchase liability insurance to answer for any judgments against them. *See* N.C. Gen.Stat. §§ 115C–40, 115C–42. This independent will of local school boards is further confirmed by provisions in North Carolina law authorizing school boards to retain private counsel without permission of the State's Attorney General. *See id.* § 114–2.3. Indeed, in this case, the School board is represented by its private counsel, and not by the Attorney General. Local school boards are capable of holding "all school property and . . . capable of purchasing and holding real and personal property, of building and repairing school houses, of selling and transferring the same for school purposes, and of prosecuting and defending suits for or against the corporation." *Id.* § 115C–40. North Carolina statute defines local school boards to be "unit[s] of local government" authorized to enter into interlocal cooperative agreements. *See id.* §§ 160A–460(2), 460A–461. The statutes also authorize local school boards to declare bankruptcy under federal law. *See id.* § 23–48. Moreover, North Carolina law provides that local school boards "shall have general control and supervision of all matters pertaining to the public schools in their respective administrative units and they shall enforce the school law in their respective units." *Id.* § 115C–36. Members of the local school boards are locally elected, not ap-

pointed by the State, *see id.* § 115C–35; and vacancies can be filled locally, *see id.* § 115C–37(c). Although local school boards must comply with certain statewide rules for the certification of teachers, *see id.* § 115C–296, and core curriculum rules, *id.* § 115C–81(a1), these general statewide criteria are enforced by the local board. Moreover, these State-imposed requirements involve *only* the substance of the educational program and not the local school board's prerogatives in administration. The fact that in limited circumstances the State Board of Education can suspend the powers of the local board, *see id.* §§ 115C–39(b), 115C–105.39(d), does not mean that, in the matters of administration and employee relations, the local school boards are not autonomous. Indeed, "the State may destroy or reshape any unit it creates.... [Y]et cities and counties do not enjoy Eleventh Amendment immunity." *Hess,* 513 U.S. at 47, 115 S.Ct. 394. In short, North Carolina law establishes local school boards with a sufficient degree of autonomy and independence that any judgment rendered against a local school board would not, in our judgment, affront the dignity of the State.

The second of the factors directs us to consider whether the School Board is involved with local or statewide concerns. The evidence relevant to this factor clearly points to local concerns as the School Board's jurisdiction is limited to Granville County. The fact that *education* is a statewide concern does not indicate otherwise. Just as law enforcement can be thought of as a statewide concern, we have nevertheless concluded that a county sheriff's duties in North Carolina can be primarily local. *See Harter,* 101 F.3d at 342.

The final factor directs us to consider how North Carolina law characterizes its local school boards—an inquiry that overlaps with our analysis of State control versus local autonomy. It appears almost without exception that State law treats local school boards as local entities, that is, more as counties than as arms of the State. Unlike the State Board of Education, whose immunity to suit is waived in a limited sense by the North Carolina Tort Claims Act, N.C. Gen.Stat. § 143–291 *et seq.,* local school boards remain immune until they procure liability insurance, *see id.* § 115C–42. The School Board is the "governing board of a county administrative unit," which in turn is denominated as a "local board." *Id.* § 115C–5. Finally, in the chapter of North Carolina General Statutes dealing with State departments, local school boards are expressly excluded from the definition of a State agency. *See id.* § 143–336.

In addition to these statutory provisions, North Carolina Supreme Court decisions have recognized school boards as local entities that are autonomous from the State. *See Turner v. Gastonia City Bd. of Educ.,* 250 N.C. 456, 109 S.E.2d 211, 216–17 (N.C. 1959) (holding that local school boards are not subject to suit under the North Carolina Tort Claims Act which, by its terms, applies only to "tort claims against the State Board of Education, the Board of Transportation, and all other departments, institutions and agencies of the State"); *see also Leandro v. North Carolina,* 488 S.E.2d 249 (N.C.1997) (deciding a case in which a local school board sued the State in its own name in a school funding case under the North Carolina constitution).

In short, we conclude that upon our consideration of each of the factors identified for determining whether a governmental entity is an arm of the State and therefore one of the United States within the meaning of the Eleventh Amendment, the Granville County Board of Education appears much more akin to a county in North Carolina than to an arm of the State. *See Regents,* 519 U.S. at 429 & n. 5, 117 S.Ct. 900; *Mt. Healthy,* 429 U.S. at 280, 97 S.Ct. 568. Indeed, it is a part of the county's governmental structure that can look to the county for part of its funding. The Supreme Court "has consistently refused to construe the [Eleventh]

Amendment to afford protection to political subdivisions such as counties and municipalities, even though such entities exercise a 'slice of State power.'" *Lake Country Estates,* 440 U.S. at 401, 99 S.Ct. 1171. The circumstances presented here are similar to those presented in *Mt. Healthy,* where the Supreme Court denied a local school board sovereign immunity.

In reaching our conclusion in this case, we continue to follow our jurisprudence, as stated in *Harter, Gray, Bockes,* and *Ram Ditta,* and in doing so, we believe that we are faithfully applying the relevant Eleventh Amendment jurisprudence announced by the Supreme Court in *Regents, Hess, Lake Country Estates,* and *Mt. Healthy.* We therefore reject the district court's view that the Supreme Court's recent decisions in *Regents* and *McMillian* overruled our decisions in *Harter, Gray, Bockes,* and *Ram Ditta.* Accordingly, for the reasons given, the judgment of the district court is reversed, and the case is remanded for further proceedings.

*REVERSED AND REMANDED.*