Leslie N. BIGGS, et al.

v.

**BOARD OF EDUCATION OF CECIL COUNTY, MARYLAND**

No. CIV. NO. L–00–1003.

United States District Court,
D. Maryland.

March 6, 2002.

Philip B. Malter, Malter & Mickum Chtd., Riva, MD, for plaintiffs.

Rochelle S. Eisenberg, Leslie R. Stellman, Hodes Ulman pessin and Katz PA, Towson, MD, for defendant.

## *MEMORANDUM*

LEGG, District Judge.

Now pending before the Court is Defendant's Motion to Dismiss, or Alternatively, for Summary Judgment. For the reasons stated herein, the Court shall, by separate Order, GRANT Defendant's Motion to Dismiss Counts I and II, GRANT Defendant's Motion for Summary Judgment on Count III, and DIRECT the Clerk to CLOSE the CASE.

## I. Background:

Leslie Biggs was born on April 24, 1985, and diagnosed with epilepsy in 1995. During the 1996–97 school year, she had frequent seizures requiring hospitalization. By the beginning of the 1997–98 school year, Ms. Biggs's condition had improved and "she was essentially seizure-free."

In the fall of 1997, Ms. Biggs began the seventh grade at Bohemia Manor Middle School in Cecil County, Maryland. During the 1997–98 school year, Ms. Biggs was subjected to taunting and teasing by some classmates, apparently on the basis of her epilepsy and physical appearance. These classmates taunted and teased Ms. Biggs by calling her, *inter alia*, "ugly dog," "seizure girl," and "Lesby," and telling her, "go have a seizure, ugly dog."

Ms. Biggs, and her mother, Mrs. Nancy Biggs, complained to the school on many occasions throughout the school year. In response to the complaints, the school took a number of steps to stop the harassment. In January of 1998, Ms. Currinder, the school guidance counselor, set up a meeting with Leslie and two boys accused of teasing her to discuss the harmful effects of teasing. In February of 1998, Mrs. Biggs gave Mr. Cole, the Vice Principal, a list of the names of eleven boys whom Leslie said had teased her. In response, Mr. Cole set up meetings with each of the accused students to discuss the incidents and explain that the teasing was unacceptable. After speaking with each student, Mr. Cole directed his secretary to send the following letter to each student's parent(s) or guardian(s):

On Monday, February 2, 1998, [student's name] was referred to the office for harassing a female student by name calling and other verbal mistreatment.

We feel that a conference is needed to discuss this matter, please telephone Bohemia Manor Middle School at 410–885–2095 to arrange this conference. If we do not hear from you by Wednesday, February 4, 1998 at 4:00 p.m., your child may be suspended from school until a conference can be arranged.

Please talk to your child about this behavior. It is a goal of the school to provide the best educational opportunities for all of our students. To reach this goal we need to maintain an atmosphere conducive to learning.

Defendant's Motion for Summary Judgment at Exhibit 19. Additionally, Mr. Cole spoke with Ms. Biggs's teachers regarding the taunting and teasing. Mr. Cole informed each teacher that "if they ever hear[d] anybody saying any harassing things to Leslie to send that kid to the office immediately." Defendant's Motion, Exhibit 17 at E.271.

While these corrections were underway, on February 12, 1998, Leslie's parents removed her from Bohemia Manor Middle School and home tutored her for the remainder of the school year. In the fall of 1998, Leslie was enrolled at the Elkton Christian School and repeated the seventh grade.

On April 10, 2000, Nancy Biggs and Allen Biggs, Jr., parents of Leslie Biggs, filed suit against Defendant Board of Education of Cecil County, Maryland. The Amended Complaint alleges the following three counts: (i) Count I, filed under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("the Rehabilitation Act"), (ii) Count II, filed under the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. ("Title II of the ADA"), and (iii) Count III, filed under Title IX of the Education Amendments of 1972, 20 U.S.C.

§ 1681 et seq. ("Title IX"). The Amended Complaint seeks damages in the amount of $300,000 on the grounds that Leslie was "denied a free appropriate public education," "suffered damages to her education performance and opportunities by having to repeat the seventh grade," and suffered emotional distress. The Amended Complaint also seeks attorney fees and costs.

On May 26, 2000, Defendant filed a Motion to Dismiss all counts, or in the alternative, for Summary Judgment on two counts. On February 2, 2001, the Court denied Defendant's Motion without prejudice to refiling after discovery. On February 28, 2001, the Court issued a scheduling order, and on August 13, 2001, following discovery, Defendant again filed a Motion to Dismiss, or Alternatively, for Summary Judgment. On February 14, 2002, the Court heard three hours of oral argument on Defendant's Motion. In preparation for the hearing, the Court submitted a list of nine questions to counsel to frame the oral argument. A copy of the list is attached hereto as Exhibit 1█

For the following reasons, the Court concludes that: (i) under the rationale of the Supreme Court's decision in *Board of Trustees of the Univ. of Alabama, et al. v. Garrett*, 531 U.S. 356, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001), the State is immune from suit under Title II of the ADA and Section 504 of the Rehabilitation Act, (ii) the local school board is a state agency entitled to invoke the protections of Eleventh Amendment immunity, and (iii) although there is a private right of action under Title IX for student-on-student sexual harassment, Defendant Board of Education is entitled to summary judgment because the board was not "deliberately

indifferent" to the taunting and teasing of Leslie Biggs.

Accordingly, the Court will, by separate Order, GRANT Defendant's Motion to Dismiss on Counts I and II, GRANT Defendant's Motion for Summary Judgment on Count III, and instruct the Clerk to CLOSE the CASE.

## II  Standards:

### A.  Motion to Dismiss:

Ordinarily, a Complaint should not be dismissed for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) unless it appears beyond all doubt that the plaintiff can prove no set of facts in support of its claim which entitle it to relief. *See Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Labram v. Havel*, 43 F.3d 918, 920 (4th Cir.1995). The liberal pleading requirements of Rule 8(a) demand only a "short and plain" statement of the claim. In evaluating such a claim, the Court must accept as true all well-pleaded allegations of fact and view them in the light most favorable to the plaintiff. *See Jenkins v. McKeithen*, 395 U.S. 411, 421–22, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969). In essence, the legal theory articulated, or even suggested, by the non-moving party must be one that could not be the basis for a ruling in that party's favor.

### B.  Summary Judgment:

The Court may grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving par-

ty is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir.1987) (recognizing that trial judges have "an affirmative obligation" to prevent factually unsupported claims and defenses from proceeding to trial.). Nevertheless, in determining whether there is a genuine issue of material fact, the Court views the facts, and all reasonable inferences to be drawn from them, in the light most favorable to the non-moving party. *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir.1987).

## III  Discussion:

### A.  Title II of the ADA and Rehabilitation Act claims:

#### 1.  Eleventh Amendment:

Defendant's Motion to Dismiss contends that (i) under the Supreme Court's analysis in *Garrett*, 531 U.S. 356, 121 S.Ct. 955 (2001), Title II of the ADA unconstitutionally attempts to abrogate the States' Eleventh Amendment sovereign immunity, and (ii) the Board of Education of Cecil County is a "state" agency entitled to immunity from suits brought pursuant to Title II of the ADA and Section 504 of the Rehabilitation Act for money damages.[1] In their Opposition, Plaintiffs counter that: (i) the *Garrett* decision is inapplicable to Title II of the ADA and Section 504 of the Rehabilitation Act, and (ii) even if *Garrett* is applicable, Defendant Board of Education is not a "state" agency entitled to Eleventh Amendment immunity.

For the following reasons, the Court finds that (i) under the rationale of the

---

**1.** Both parties are agreed that Title II of the ADA and Section 504 of the Rehabilitation Act are subject to the same sovereign immunity analysis. Accordingly, the Court's analysis of sovereign immunity with respect to Title II of the ADA applies with equal force to Section 504 of the Rehabilitation Act.

Supreme Court's decision in *Garrett,* the state is immune from suit under Title II of the ADA, and (ii) the local school board is a state agency entitled to invoke Eleventh Amendment immunity.

### a. Congress did not properly abrogate the sovereign immunity of states in Title II of the ADA:

■ Defendant contends that the Court should extend the logic of the Supreme Court's decision in *Garrett* to Title II of the ADA.[2] In *Garrett,* the Supreme Court held that Congress had not properly abrogated the States' Eleventh Amendment immunity in Title I of the ADA. Although the Supreme Court's decision in *Garrett* was expressly limited to Title I of the ADA, the Court finds that the logic and analysis of the opinion are also applicable to Title II of the ADA.[3]

Under the Supreme Court's Eleventh Amendment jurisprudence, "Congress may abrogate the States' Eleventh Amendment immunity when it both unequivocally intends to do so and act[s] pursuant to a valid grant of constitutional authority." *Id.* at 365, 121 S.Ct. 955 (internal citations omitted). The first requirement is not in dispute in this case.[4] The crux of the dispute is, therefore, whether Congress abrogated the States' Eleventh Amendment immunity in Title II pursuant to a valid grant of constitutional authority.

■ Congress may only "subject nonconsenting States to suit in federal court when it does so pursuant to" § 5 of the Fourteenth Amendment. *Garrett,* 531 U.S. at 364, 121 S.Ct. 955; *see also Seminole Tribe of Fla. v. Florida,* 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) (Congress may not abrogate a States' immunity pursuant to its Article I powers). Section 1 of the Fourteenth Amendment provides that:

> No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. CONST. amend. XIV, § 1. Section 5 of the Fourteenth Amendment gives Congress "the power to enforce the substantive guarantees contained in § 1 by enacting 'appropriate legislation.'" *Garrett,* 531 U.S. at 365, 121 S.Ct. 955 (citing *City of Boerne v. Flores,* 521 U.S. 507, 536, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997)).

The enforcement power granted to Congress under § 5 is limited to remedying "violations of constitutional rights" and may not be used to "define the substance of those rights." *Brown v. North Carolina Division of Motor Vehicles,* 166 F.3d 698, 705 (4th Cir.1999). "Congress' power 'to enforce' ... includes the authority ...

---

**2.** Several federal courts have found that Congress did not validly abrogate the States' Eleventh Amendment immunity in Title II of the ADA. *See Reickenbacker v. Foster,* 274 F.3d 974 (5th Cir.2001); *Alsbrook v. City of Maumelle,* 184 F.3d 999 (8th Cir.1999); *Neiberger v. Hawkins,* 150 F.Supp.2d 1118 (D.Colo. 2001). The Fourth Circuit Court of Appeals has held that a regulation enacted pursuant to Title II of the ADA did not validly abrogate the States' Eleventh Amendment immunity. *Brown v. North Carolina Division of Motor Vehicles,* 166 F.3d 698 (4th Cir.1999).

**3.** Title I of the ADA prohibits discrimination by employers against employees or prospective employees because of their disabilities, whereas Title II of the ADA prohibits discrimination by public entities on the basis of disability in the provision of programs and benefits.

**4.** Parties are agreed that Congress unequivocally sought to abrogate the States' Eleventh Amendment immunity in Title II of the ADA.

to deter violation of rights guaranteed thereunder by prohibiting a somewhat broader swath of conduct, including that which is not itself forbidden by the Amendment's text." *Kimel v. Florida Bd. of Regents,* 528 U.S. 62, 81, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000). Where § 5 legislation reaches "beyond the scope of § 1's actual guarantees [it] must exhibit congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *Garrett,* 531 U.S. at 365, 121 S.Ct. 955 (internal citations omitted).

■ The first step in this analysis, therefore, is to "examine the limitations that § 1 of the Fourteenth Amendment places on States' treatment of the disabled." *Id.* The disabled are not a suspect or quasi-suspect class under the Supreme Court's equal protection jurisprudence. *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). As a result,

> States are not required by the Fourteenth Amendment to make special accommodations for the disabled, so long as their actions toward such individuals are rational. They could quite hardheadedly—and perhaps hardheartedly—hold to job-qualification requirements which do not make allowance for the disabled. If special accommodations for the disabled are to be required, they have to come from positive law and not through the equal protection clause.

*Garrett,* 531 U.S. at 367–68, 121 S.Ct. 955.

The duty to accommodate imposed by Title II of the ADA reaches beyond the actual rights guaranteed in § 1 of the Fourteenth Amendment. To determine whether Title II validly abrogates the States' immunity, therefore, the Court

must examine: (i) whether "a pattern of irrational state discrimination" in public services against the disabled exists, *id.* at 368, 121 S.Ct. 955, and (ii) whether Title II is "appropriate" § 5 legislation.

### (1) Pattern of State Discrimination:

During oral argument, Plaintiff's counsel contended that Appendix C to Justice Breyer's dissent in *Garrett* supports a finding of a pattern of irrational state discrimination against the disabled in the provision of public services.[5] Appendix C contains "roughly 300 examples of discrimination by state governments themselves in the legislative record." *Id.* at 379, 121 S.Ct. 955 (Breyer, J., dissenting). Further, as even the majority in *Garrett* noted, "[t]he overwhelming majority of these accounts pertain to alleged discrimination by the States [in areas] addressed in Titles II and III of the ADA." *Id.* at 372, n. 7, 121 S.Ct. 955. The accounts, however, are confined to one sentence descriptions of instances of discrimination against the disabled—e.g., in Maryland, "vocational rehabilitation counselors failed to help deaf people find jobs." *Id.* at 409, 121 S.Ct. 955. Such limited information is insufficient to determine whether a pattern of discrimination by States exists.

Furthermore, even if Appendix C exhibits a pattern of discrimination, it is unclear whether such discrimination is unconstitutional. Because classifications of the disabled are entitled to only rational basis review, "adverse, disparate treatment often does not amount to a constitutional violation...." *Id.* at 370, 121 S.Ct. 955 (internal citations omitted). The Court, however, need not decide whether Title II was enacted to remedy a pattern of irrational state discrimination against the disabled because, as discussed below, the

---

**5.** Appendix C consists of a list of submissions regarding discrimination against the disabled compiled by the Task Force on Rights and Empowerment of Americans with Disabilities.

Court finds that Title II is not "appropriate" § 5 legislation.

## (2) Congruence and proportionality:

Legislation is "appropriate," only if there is "congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *Id.* at 365, 121 S.Ct. 955. This requires the Court to examine whether Title II "prohibits substantially more [State conduct] than would likely be held unconstitutional under the applicable equal protection, rational basis standard." *Kimel*, 528 U.S. at 86, 120 S.Ct. 631.

Title II of the ADA defines a "qualified individual with a disability" as:

> an individual with a disability who, with or without *reasonable modifications* to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by the public entity.

42 U.S.C. § 12131(2) (emphasis added). This definition has been interpreted through regulations and court decisions to create an obligation under Title II to make "reasonable modifications," subject to the limitation that the modification not "fundamentally alter the nature of the service or activity." 28 C.F.R. § 35.130(b)(7). As the Court in *Garrett* stated, "even with this exception, the accommodation duty far exceeds what is constitutionally required in that it makes unlawful a range of alternative responses that would be reasonable but would fall short of imposing an 'undue

burden' upon the employer." 531 U.S. at 372, 121 S.Ct. 955. Accordingly, the obligation to provide reasonable accommodation exceeds the obligation that the State would have under the rational basis standard.

Thus, the Court concludes that even if Congress identified a pattern of irrational state discrimination, the obligations imposed by Title II of the ADA exceed the obligations imposed by the Fourteenth Amendment, and therefore, are neither congruent with nor proportional to the targeted harm. Accordingly, Congress did not validly abrogate the States' Eleventh Amendment immunity in Title II of the ADA, and the State may not be sued for monetary damages under Title II.[6]

### b. Board of Education of Cecil County is a state actor:

Plaintiff further contends that Defendant Board of Education of Cecil County is not a state actor entitled to invoke the protections of Eleventh Amendment immunity. The Eleventh Amendment preserves the sovereign immunity of States, state agents, and state instrumentalities. Eleventh Amendment immunity does not extend, however, to " 'counties and similar municipal corporations.' " *Cash v. Granville County Board of Education*, 242 F.3d 219, 222 (4th Cir.2001) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)). Accordingly, Plaintiff argues that Defendant Board of Education of Cecil County is not a "state" agent entitled to Eleventh Amendment immunity.

Under the Fourth Circuit Court of Appeals' decision in *Cash*, Defendant Board

---

6. This ruling does not mean that a disabled student whose education is hampered by severe harassment by schoolmates is without a remedy. At oral argument, counsel for Defendant Board of Education agreed that a student covered by either the IDEA, 20 U.S.C. § 1400 *et seq.*, or ADA could bring a suit for injunctive relief if unaddressed harassment were hampering her education.

of Education may establish that it is a state agency entitled to Eleventh Amendment immunity in one of two ways: (i) if the judgment against the board of education would be paid from the state treasury, and (ii) "if the judgment would adversely affect the dignity of the State as a sovereign and as one of the United States." *Id.* at 223–24; *see also Jones v. Frederick County Board of Education*, 689 F.Supp. 535 (D.Md.1988) (considering similar factors and concluding that the board of education was a state agency).

In this case, the judgment is not directly paid from the state coffers. Accordingly, the Court must determine whether the judgment would "affect the dignity of the State as a sovereign." The *Cash* court considered the following factors when making this determination: (1) "the degree of control that the state exercises over the entity . . .;" (2) whether the scope of the entity's concerns is statewide or local; and (3) "the manner in which state law treats the entity." *Id.* at 224.

The Court concludes that the Board is a state agency for the purposes of the Eleventh Amendment. First, the State of Maryland exercises a great degree of control over Maryland county school boards. Senior Judge Joseph H. Young of this Court noted in *Jones* that,

> Maryland law creates the county boards of education and governs their composition and membership . . . . The county boards must obtain the state's approval regarding the establishment of schools, acquisition or disposition of property, construction or renovation of buildings, and curriculum. The state appropriates

substantial funds to support the county boards. In return, the county boards must acquiesce to an annual audit and submit an annual budget to the state . . . .

689 F.Supp. at 537–38 (internal citations omitted). Second, Maryland law consistently and repeatedly has treated local school boards as agencies of the state.[7] *See, e.g., Chesapeake Charter, Inc. v. Anne Arundel County Bd. of Educ.*, 358 Md. 129, 747 A.2d 625 (2000); *Montgomery County Educ. Association v. Board of Educ. of Montgomery County*, 311 Md. 303, 534 A.2d 980 (1987); *Board of Educ. of Prince George's County v. Prince George's County Educators' Ass'n*, 309 Md. 85, 522 A.2d 931 (1987).

Based upon the aforementioned factors, the Court concludes that the Board of Education for Cecil County is a state actor under the Eleventh Amendment. Accordingly, the Board of Education is immune from suit for monetary damages under Title II of the ADA.

## 2. Alternatively, Plaintiffs have not made out a prima facie case:

Moreover, the Court finds that even if Congress had properly abrogated Defendant's immunity in Title II of the ADA, Mr. and Mrs. Biggs would be unable to make out a prima facie case of peer-on-peer disability harassment under the ADA and Section 504. There was some dispute between the parties over the appropriate standard for making out a prima facie case under the ADA and Section 504. The Court is persuaded that the correct standard is the one articulated by the Supreme Court in *Davis v. Monroe County Board of*

---

7. The United States District Court for the District of Maryland repeatedly has held that local school boards are state actors for the purposes of the Eleventh Amendment. *See, e.g., Jones*, 689 F.Supp. at 538; *Chi v. Board of Educ. of Harford County*, 1995 WL 131288,

**3–4, 1995 U.S. Dist. LEXIS 3735, *8–9 (D.Md.1995); *Rosenfeld v. Montgomery County Pub. Schs.*, 41 F.Supp.2d 581, 586 (D.Md. 1999); *Eisenberg v. Montgomery County Public Schools*, 19 F.Supp.2d 449, 452–53 (D.Md. 1998).

*Education,* 526 U.S. 629, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999), for harassment claims under Title IX.

[redacted] According to *Davis,* a prima facie case of peer-on-peer disability harassment, would require proof of the following: (i) that Leslie Biggs was an individual with a disability, (ii) that she was harassed based on her disability, (iii) that the harassment was sufficiently severe or pervasive that it altered the condition of her education and created an abusive educational environment, (iv) that defendant knew about the harassment, and (v) that defendant was deliberately indifferent to the harassment. *Id.* at 650, 119 S.Ct. 1661.

[redacted] There is no evidence that the Board of Education was "deliberately indifferent" to the harassment.[8] The Court in *Davis* set a very high standard for "deliberate indifference," giving the following example:

> ... male students physically threaten their female peers every day, successfully preventing the female students from using a particular school resource—an athletic field or a computer lab, for instance. District administrators are well aware of the daily ritual, yet they deliberately ignore requests for aid from the female students wishing to use the resource. The district's knowing refusal to take any action [would qualify as deliberate indifference].

*Id.* at 650–51, 119 S.Ct. 1661.

In contrast to the aforementioned example, each and every time Ms. Biggs complained, the school took action—e.g., counseling Ms. Biggs, meeting with the offending students, sending letters to parents, threatening suspension, and alerting teachers to the problem. Thus, the Court concludes that the school board's responses to Ms. Biggs's complaints do not approach the "deliberate indifference" standard articulated in *Davis.*

B. **Title IX Harassment Claim:**

[redacted] Plaintiff has also asserted a claim under Title IX for peer-on-peer sexual harassment. Assuming arguendo that the teasing and taunting of Ms. Biggs qualifies as harassment based on her sex,[9] as stated *supra* Part III.B, Cecil County was not "deliberately indifferent" to the harassment of Ms. Biggs as required under the *Davis* test. Accordingly, Plaintiffs' claim under Title IX must fail.

IV **Conclusion:**

For the aforementioned reasons, the Court shall, by separate Order, GRANT Defendants' Motion to Dismiss Counts I and II, and GRANT Defendants' Motion for Summary Judgment on Count III. The Clerk is directed to CLOSE the CASE.

[redacted]

8. Furthermore, there is some dispute over whether Ms. Biggs's epilepsy is a "disability" within the meaning of the ADA.

9. Parties disagree over whether comments such as "lesi," "lesby," and "dike" constitute harassment based on Ms. Biggs's sex.