Patricia HOLMES, Plaintiff–Appellee,

and

United States of America, Intervening Plaintiff–Appellee,

v.

MARION COUNTY OFFICE OF FAMILY AND CHILDREN, Defendant–Appellant.

No. 02–1377.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 1, 2002.

Decided June 27, 2003.

On Petition for Rehearing— Nov. 19, 2003.

Deborah E. Albright (argued), Monday, Rodeheffer, Jones & Albright, Indianapolis, IN, for Plaintiff–Appellee.

Thomas M. Fisher (argued), Office of the Attorney General, Indianapolis, IN, for Defendant–Appellant.

Sarah E. Harrington (argued), Department of Justice, Washington, DC, for Intervenor–Appellee.

Robert L. Strayer, Office of the Ohio Attorney General, Columbus, OH, for Amicus Curiae.

Before BAUER, POSNER, and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

Patricia Holmes, an employee of Indiana's child-welfare system, took two days of paid leave rather than comply with a directive to remove a headwrap required by her faith. She filed suit under Title VII of the Civil Rights Act of 1964, contending that Indiana discriminated against her on account of her religion. She relies on a definition in § 701(j) of that Act, 42 U.S.C. § 2000e(j), which provides that religion "includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business."

## I

Holmes's employer, the Marion County Office of Family and Children, concedes that it has a duty not to discriminate against any religious faith but relies on *Employment Division v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), for the proposition that it need not accommodate religiously inspired practices adversely affected by rules that are neutral with respect to religion. To the extent an accommodation requirement extends beyond the first amendment, the employer insists, it rests on the Constitution's commerce clause and not on § 5 of the fourteenth amendment. That does not undermine § 701(j)'s validity as applied to state employees, see *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985), but does affect where litigation must occur—for, when Congress acts only under the commerce power, the eleventh amendment permits states to insist that suit be in state court. Compare *Fitzpatrick v. Bitzer*, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976), with *Seminole Tribe v. Florida*, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). In *Boerne v. Flores*, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), the Court concluded that the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb to § 2000bb–4, exceeds the power granted by § 5 and therefore may not support a private action in federal court against a state. The employer submits that § 701(j), which like the RFRA requires accommodation rather than neutrality, also is not § 5 legislation. After the United States intervened to defend the constitutionality of Title VII, the district judge rejected this argument and held that litigation may proceed in federal court. *Holmes v. Marion County Office of Family and Children*, 184 F.Supp.2d 828 (S.D.Ind.2002). The employer immediately appealed. See *Lapides v. University of*

*Georgia,* 535 U.S. 613, 122 S.Ct. 1640, 152 L.Ed.2d 806 (2002); *Puerto Rico Aqueduct & Sewer Authority v. Metcalf & Eddy, Inc.,* 506 U.S. 139, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993).

 Holmes's complaint, the only thing we have to go on, alleges: "August 13, 1998, I wore a geles (headwrap) as part of my religious practice. My supervisor, Teresa Howard, informed me if I didn't remove my headgear I would be written up for insubordination for violating a dress code policy. I informed Ms. Howard that due to religious reasons I could not take my geles off. I had to take two vacation days to avoid being disciplined." Although the Constitution does not compel a public employer to allow religious headcoverings that violate neutral dress codes, see *Goldman v. Weinberger,* 475 U.S. 503, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986); *Menora v. Illinois High School Association,* 683 F.2d 1030 (7th Cir.1982), toleration of religious diversity in this respect is a wise policy in a pluralistic society. See *United States v. James,* 328 F.3d 953, 957–58 (7th Cir. 2003). Accommodation would be reasonable. Contrast *Endres v. Indiana State Police,* 334 F.3d 618 (also decided today). Whether Indiana could establish "undue hardship"—on which see *Trans World Airlines, Inc. v. Hardison,* 432 U.S. 63, 84, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977), and *Ansonia Board of Education v. Philbrook,* 479 U.S. 60, 67–69, 107 S.Ct. 367, 93 L.Ed.2d 305 (1986)—is not at issue this early in the case. It is enough to say that the complaint survives any challenge under Rule 12(b)(6), so we must decide whether further litigation takes place in state rather than federal court.

## II

Before doing this, however, we need to say more about our own jurisdiction. There are two potential problems, even taking as given the holding of *Lapides* and *Puerto Rico Aqueduct & Sewer Authority* that a state's invocation of the eleventh amendment normally permits an interlocutory appeal.

 The first is that the case is in federal court to stay. Holmes alleged, after the language we have quoted: "Other employees wore headgear or hats and were not threatened as I was." That disparate-treatment claim does not depend on the accommodation rule in § 701(j). Indiana concedes that it may be litigated in federal court, because Title VII is § 5 legislation to the extent it enforces the Constitution's own rule against religious discrimination. One may wonder what sense it makes to entertain an interlocutory appeal about a single line of legal argument even though another legal theory requires the same defendant to litigate in the same court no matter how the appeal comes out. Holmes advances only one claim for relief, supported by multiple legal theories, each of which (if successful) would lead to the same money damages: two days' pay. But *Behrens v. Pelletier,* 516 U.S. 299, 311–12, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996), says that an interlocutory immunity appeal may contest a single theory of liability, even though success will not end the case, at least if the potential relief differs—and Holmes's victory on an accommodation theory would lead to prospective relief different from what would follow victory on a disparate-treatment theory. After *Behrens,* the fact that a defendant is not asserting an unqualified "right not to be tried in federal court" does not preclude an interlocutory appeal based on a claim of immunity.

 Second, and more complex, is the question whether the Marion County Office of Family and Children, the defendant in Holmes's suit, *is* the State of Indiana. If, as its name implies, it is a unit of county rather than state government, then it gets no benefit from the eleventh

amendment, see *Lincoln County v. Luning*, 133 U.S. 529, 10 S.Ct. 363, 33 L.Ed. 766 (1890), and is amenable to suit in federal court whether or not § 701(j) "enforces" the fourteenth amendment. See *University of Alabama v. Garrett*, 531 U.S. 356, 368, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001).

Twenty-five years ago we ruled that Indiana's county welfare departments are not "the state" for purposes of the eleventh amendment. See *Mackey v. Stanton*, 586 F.2d 1126, 1130–31 (7th Cir.1978). In 1986 Indiana revised the organization of its child-welfare system; county welfare departments became county offices of family and children, and their workers became state employees. *Baxter v. Vigo County School Corp.*, 26 F.3d 728, 732–33 (7th Cir.1994), holds that these changes do not affect *Mackey* 's conclusion: these organizations still are units of local rather than state government, principally because the money to pay for child-welfare services comes from local taxes.

Relying on *J.A.W. v. Indiana*, 687 N.E.2d 1202 (Ind.1997), the state asks us to overrule *Baxter*. The Supreme Court of Indiana concluded in *J.A.W.* that we misunderstood how the state's child-welfare system is organized after the 1986 legislation. That law, *J.A.W.* concluded, made all family-welfare officials full-fledged state employees in a chain of command that extends to the Governor. All of these workers are paid directly from the state treasury. County offices are part of the state in such a structure in the same way the Indianapolis office of the Department of Health and Human Services is part of the federal government. Some taxes to raise funds for welfare benefits are collected at the local level, but *J.A.W.* holds that the county acts in this respect as an agent of the state: "county governments were largely rendered tax collectors for the State" (687 N.E.2d at 1213).

"When the county departments were transformed into subordinate agencies of the state[ ] in 1986, the county governments became—with respect to these activities—financial agents of the state. We so hold as a matter of state law." *Id.* at 1215.

Indiana's system brings to mind the way the United States apportioned direct taxes among the states before the sixteenth amendment. Sharing of authority among units of government complicates both practical administration and legal characterization. Even if as a matter of state law the counties act as agents of the state in raising and remitting revenues, it remains a matter of federal law whether this makes each county's department part of the state. See *Hess v. Port Authority Trans–Hudson Corp.*, 513 U.S. 30, 115 S.Ct. 394, 130 L.Ed.2d 245 (1994). The dispositive question is more "who pays?" than "who raised the money?". See *University of California v. Doe*, 519 U.S. 425, 117 S.Ct. 900, 137 L.Ed.2d 55 (1997) (if state pays, the fact that the money came to the state from the federal Treasury does not matter). We need not decide whether *J.A.W.* alone would cause us to overturn the holding of *Baxter*, however, because Indiana changed its law again in 2000.

*Baxter* relied principally on I.C. 12–19–3–2, which established a welfare fund in each county. The fund was raised by a tax on all taxable property in the county, plus the issuance of bonds secured by future property taxes, see I.C. 12–19–3–12 through 12–19–3–16. These provisions were repealed effective January 1, 2000, by I.C. 12–19–1–21. Counties still have the ability to levy taxes to fund certain services (the fund is called the "family and children's fund"), but that money is used only for "child services." I.C. 12–19–7–3. "Child services" is a defined term, see I.C. 12–19–7–1, that does not include any personnel or administrative costs. These

come exclusively from the state treasury. See I.C. 12–19–1–8 and 12–19–1–9. The damages Holmes seeks therefore would be paid by the state itself. (The events of which she complains occurred in 1998, but Indiana charges damages against current appropriations.) The combination of *J.A.W.* and the 2000 legislation leads us to conclude that county offices of family and children in Indiana now must be classified as part of the state for purposes of the eleventh amendment. This does not require the overruling of *Baxter*, which dealt with superseded legislation. It is enough to say that the statutes now in force make county offices part of the state, as *J.A.W.* held and as the formal organization chart now shows them.

## III

■ Thus we arrive at the question whether a claim against a state, based on the accommodation clause of § 701(j), may be litigated in federal court. The parties' dispute concerns venue, not substance: it is the validity of § 701(a), to the extent it authorizes private parties to sue a state in federal court, and *not* the validity of § 701(j), that is at issue—for legislation based on the commerce clause may be applied to states (as employers) via suits brought by the federal government in federal court, or via private suits in state courts that are already open to litigation against the state. See *Alden v. Maine*, 527 U.S. 706, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999).

Indiana's argument is a simple one. Section 5 of the fourteenth amendment authorizes Congress to "enforce" the other provisions of that amendment. A requirement of accommodation does not "enforce" the free exercise clause (applied to the states by § 1 of the fourteenth amendment), for *Smith* holds that a state complies with the free exercise clause by maintaining neutrality toward religiously motivated practices. The Court treated

*Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), and similar decisions as prohibiting disparate treatment but not requiring accommodation— which is a step that the Court equated with departure from neutrality. *Boerne* accordingly concluded that the Religious Freedom Restoration Act is not based on the power to "enforce" the fourteenth amendment. In *Boerne* not a single Justice thought that a statutory demand for accommodation could be deemed a law to "enforce" the free exercise clause as *Smith* had interpreted it; the only seriously debated question was whether to overrule *Smith* (which the Court did not do). Likewise *Garrett* holds that the Americans with Disabilities Act, to the extent it requires accommodation rather than disregard of disabilities, does not rest on the § 5 enforcement power. See also *Erickson v. Northeastern Illinois University*, 207 F.3d 945 (7th Cir.2000). Indiana asks us to equate accommodation under § 701(j) with accommodation under the RFRA and the ADA.

Plaintiffs and the United States reply that § 701(j) can be enforcement legislation even though it departs from the Constitution's own rules, provided that it is "congruent and proportional" to them—in other words, that it is a reasonable way to prevent evasions of constitutional rules. See *Nevada Department of Human Resources v. Hibbs*, —— U.S. ——, 123 S.Ct. 1972, 155 L.Ed.2d 953 (2003), which holds that the family-leave provisions of the Family and Medical Leave Act may be sustained under the § 5 power because they root out sex-based stereotypes. The Court stressed in *Hibbs* that Congress compiled a legislative record showing that many states used to discriminate explicitly on account of sex and may continue to do so (either subconsciously or deliberately but in disguise) in the absence of preventive legislation. Family leave is "congruent" to the constitutional rule because

it is designed to reduce the scope for stereotypical thinking and "proportional" because it imposes a modest requirement: family leave is limited in time and is unpaid. Limits built into § 701(j) satisfy the proportionality element of this analysis: § 701(j) demands much less of a state than the RFRA did (and less than the FMLA does, too). The RFRA demanded that the state show a compelling interest, while under *Hardison* even a slight burden is "undue hardship." Yet the employer's burden under § 701(j) is identical to that under the ADA, which *Garrett* held to be unsupported by § 5. So we must inquire whether § 701(j) is "congruent" to the free exercise clause, even though the RFRA was not (and the ADA's accommodation rule has been held not congruent to the equal protection clause).

The idea behind "congruence" is that Congress may respond to a history of concealable violations by adopting precautionary rules that reduce either the chance of evasion or the influence of lingering stereotypical beliefs. Congress can't change the constitutional rule of decision, but it may add teeth so that the Constitution's rule has practical bite. Many violations of the equal protection clause are concealable, for disparate impact is not actionable, and the disparate-treatment rule requires proof of intent to use the forbidden characteristic. See, e.g., *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). When stereotypical thinking underlies a decision, the line between disparate treatment and disparate impact blurs, and it may be difficult indeed to prove a claim. The Court held in *Hibbs* that, when a history of real discrimination has been documented, § 5 permits Congress to address established patterns of stereotypical thinking without requiring proof of discriminatory intent.

Section 701(j) does not fit that model. Discrimination by public employers against their employees' religiously inspired practices does not have the same history as discrimination on account of race or sex, and states rarely have resorted to legislation with a veneer of neutrality designed to mask a forbidden discriminatory plan. *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993), offers one of the few examples—and as it was not enough to persuade the Court that the RFRA matches a constitutional problem, it is hard to see why § 701(j) would be congruent to a constitutional problem. (Note that *Lukumi Babalu Aye* itself had nothing to do with employment by state agencies.) *Hibbs* stressed that, before enacting the FMLA, Congress had compiled a record of subtle sex discrimination reflected in employers' leave policies. Before enacting Title VII, Congress had not compiled such a record of subtle discrimination against religious practices. In 1964 the legislature concentrated on race discrimination; religion and sex were afterthoughts. There was no legislative record at all in the Senate, where the bill was not referred to committee, lest it be bottled up by opponents. And in 1972, when Title VII was extended to the states, again the record is empty of evidence that state employers had engaged in subtle discrimination.

The United States concedes that before enacting Title VII Congress did not compile *any* legislative record on the question whether states were violating their constitutional obligations with respect to religious practices in public workplaces. When seeking rehearing, the United States contended that one committee in 1961 heard testimony about religious discrimination, but (a) accommodation differs from an anti-discrimination rule, and (b) Congress is not a continuous body: 1961 is a long way from 1972. What is more, the legislative proposals under study in 1961 differed from § 701(h).

Although the Supreme Court has consistently limited its review to the legislative record, see, e.g., *Garrett*, 531 U.S. at 356, 121 S.Ct. 955, we nonetheless assume that, if the history were written elsewhere for all to see, as the history of race and sex discrimination is, then the lack of a legislative record would not matter. Often a "legislative record" reflects only the ability of advocacy groups to have favorable tidbits recited by tame witnesses during staged hearings. Members of Congress are not professional historians; they do not conduct scholarly research or even make findings after the fashion of juries. Legislative "records" are compiled but not evaluated, voted on, or presented to the President (or the judiciary) for approval. Section 5 does not condition legislative power on the ability of interest groups or committee chairmen to ladle anecdotes into hearing transcripts. Legislative power under § 5 depends on the state of the world, not the state of the Congressional Record.

Yet the Executive Branch did not file in this court a brief that supplies the details missing from the legislative record; nor does the United States' brief point to any scholarly writings that illuminate the history. Its petition for rehearing narrates instances of disparate treatment, but not any episodes of the sort of conduct for which § 701(h) is designed. All of the events to which the United States points at pages 10–14 of its petition are instances of "de jure restrictions on the free exercise" of religion (petition at 10). In other words, they are violations of the equal treatment rule and thus are actionable without regard to § 701(h). As we have emphasized, prohibiting disparate treatment and requiring accommodation are distinct subjects. Moreover, none arose from public employment by state or local governments. It is hard to see how the existence of disparate treatment in the

past (and outside the domain of public employment) can justify an accommodation requirement covering *only* public employment. We have been given no reason whatever to think that subtle, hard-to-catch, discrimination against religious practices is now, or ever has been, a problem in state employment. Although hostility to Catholicism was common in many states during the nineteenth century, and some states adopted local versions of the Blaine Amendment, see *Mitchell v. Helms*, 530 U.S. 793, 828–29, 120 S.Ct. 2530, 147 L.Ed.2d 660 (2000) (plurality opinion), that period was behind us long before the enactment of Title VII. For much of the twentieth century, public employers *counteracted* religious discrimination in the private sector, hiring those who had difficulty finding private jobs suited to their skills. The foundation for a decision such as *Hibbs* is missing with respect to § 701(j).

 Logic does not furnish what history lacks. An accommodation requirement does not reinforce the constitutional approach; to the contrary, neutrality (which is both necessary to avoid disparate treatment and, under *Smith*, sufficient to avoid any violation) differs substantially from accommodation. Neutrality is blind to religion; accommodation requires consciousness of religion and entails a demand that believers and non-believers receive different treatment. One Justice believes that, for this reason, accommodation is itself a violation of the establishment clause. See *Boerne*, 521 U.S. at 536–37, 117 S.Ct. 2157 (Stevens, J., concurring). Though this is a minority view, all of the other Justices recognize that there is a difference and a potential tension between an anti-discrimination rule and an accommodation requirement. So in the absence of some need to use accommodation to counteract evasions of the antidiscrimination principle, § 701(j) cannot be called an ancillary rule that is congruent with the constitutional norm that Congress is entitled

to enforce. This means that § 701(j) rests on the commerce clause alone, and that § 701(a) therefore may not be used to compel a state to defend in federal court a private suit seeking accommodation of a religious practice. Holmes has not named any state official as a defendant in order to seek prospective relief, contrast *Bruggeman v. Blagojevich,* 324 F.3d 906, 912–13 (7th Cir.2003) (discussing the application of *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908)), so all variations of the accommodation theory belong in state court.

The decision of the district court is vacated, and the case is remanded with instructions to dismiss that portion of the complaint that alleges failure to accommodate, while retaining that portion of the complaint that alleges disparate treatment.