RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 10a0192p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNEEK VIRGINIA LOWE,

        *Plaintiff-Appellee*,

    *v.*

HAMILTON COUNTY DEPARTMENT OF JOB &
FAMILY SERVICES, et al.,

        *Defendants-Appellants*.

No. 09-3432

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 05-00117—Susan J. Dlott, Chief District Judge.

Argued: January 13, 2010

Decided and Filed: July 1, 2010

Before: SUHRHEINRICH, COLE, and GILMAN, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Michael G. Florez, HAMILTON COUNTY PROSECUTOR'S OFFICE, Cincinnati, Ohio, for Appellants. Randolph H. Freking, FREKING & BETZ, LLC, Cincinnati, Ohio, for Appellee. **ON BRIEF:** Michael G. Florez, Kathleen H. Bailey, HAMILTON COUNTY PROSECUTOR'S OFFICE, Cincinnati, Ohio, for Appellants. Randolph H. Freking, FREKING & BETZ, LLC, Cincinnati, Ohio, for Appellee.

    COLE, J., delivered the opinion of the court, in which GILMAN, J., joined. SUHRHEINRICH, J. (pp. 17-20), delivered a separate opinion concurring with the judgment.

_____

**OPINION**

_____

    COLE, Circuit Judge. Plaintiff-Appellee Uneek Lowe instituted this employment discrimination case against Defendant-Appellant Hamilton County Department of Job and Family Services ("HCJFS") alleging race, age, and disability discrimination, as well as

1

retaliation. The district court granted HCJFS summary judgment on Lowe's race and age discrimination claims, but denied HCJFS summary judgment on Lowe's disability discrimination and retaliation claims. HCJFS appeals the denial of summary judgment on these claims. For the following reasons, we **AFFIRM** the district court's denial of summary judgment.

## I. BACKGROUND

Uneek Lowe was hired by HCJFS as a Medicaid eligibility technician on January 20, 2000. Her main job duty was to determine the ongoing eligibility of Medicaid beneficiaries. Lowe has a history of depression and, in 2002, was diagnosed with Attention Deficit Hyperactivity Disorder. In May 2003, Lowe requested that HCJFS grant her reasonable accommodations for her disability. Over the next two years, the relationship between Lowe and HCJFS deteriorated as Lowe clashed with her supervisors, received her first unfavorable performance review, took several leaves of absence pursuant to the Family and Medical Leave Act ("FMLA"), was twice transferred to new (but similar) positions, and became the subject of HCJFS disciplinary proceedings. Finally, in a letter dated July 6, 2005, HCJFS terminated Lowe while she was on FMLA leave.

Prior to her termination, on June 10, 2004, Lowe filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging race and disability discrimination and retaliation. On November 4, 2004, the EEOC issued Lowe a "right-to-sue" letter based on her complaint. On December 15, 2004, Lowe filed an additional charge of discrimination with the EEOC, alleging retaliation following her initial complaint. She also filed an identical charge with the Ohio Civil Rights Commission, which she later withdrew. On February 23, 2005, Lowe commenced this action pro se in federal district court based on her initial EEOC complaint and "right-to-sue" letter. On June 3, 2005, the EEOC issued a second "right-to-sue" letter to Lowe, based on her second charge of discrimination. Following her termination, Lowe amended her complaint to include allegations regarding her termination and a number of additional claims.

HCJFS filed a motion to dismiss, or alternatively for summary judgment, arguing, in part, that it was an arm of the State of Ohio entitled to Eleventh Amendment sovereign

immunity on all of Lowe's claims.  Although the district court granted HCJFS summary judgment on a number of Lowe's claims, it concluded that HCJFS was not entitled to sovereign immunity and denied summary judgment on Lowe's disability discrimination and retaliation claims.  HCJFS appeals the district court's denial of summary judgment on these claims.  HCJFS argues that it is entitled to summary judgment because (1) it enjoys sovereign immunity under the Eleventh Amendment; (2) Lowe failed to exhaust the required administrative remedies; and (3) the district court erred in finding that Lowe was qualified for her job as part of its determination that Lowe had set forth a prima facie case of disability discrimination.

## II.  ANALYSIS

### A.  Subject Matter Jurisdiction

Generally, the denial of a motion for summary judgment is not immediately appealable.  However, we have jurisdiction over the district court's denial of sovereign immunity to HCJFS under the collateral order doctrine.  "Because 'sovereign immunity is an immunity from trial, not just a defense to liability on the merits, the denial of a claim of sovereign immunity is immediately appealable under the collateral order doctrine as a final decision, pursuant to 28 U.S.C. § 1291.'"  *O'Bryan v. Holy See*, 556 F.3d 361, 372 (6th Cir. 2009) (quoting *Keller v. Cent. Bank of Nig.*, 277 F.3d 811, 815 (6th Cir. 2002)); *see also P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 147 (1993) ("We hold that States and state entities that claim to be 'arms of the State' may take advantage of the collateral order doctrine to appeal a district court order denying a claim of Eleventh Amendment immunity.").

We do not have jurisdiction over the other two issues raised by HCJFS on appeal because they do not fall under the collateral order doctrine nor are they inextricably intertwined with the issue of sovereign immunity.  The "small category" of decisions that fall under the collateral order doctrine "includes only decisions that are conclusive, that resolve important questions separate from the merits, and that are effectively unreviewable on appeal from the final judgment in the underlying action."  *Swint v. Chambers County Comm'n*, 514 U.S. 35, 42 (1995) (citing *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949)).

HCJFS's arguments that Lowe did not exhaust the required administrative remedies nor make out a prima facie case of disability discrimination do not meet these requirements and thus do not qualify for appellate review under the collateral order doctrine. Therefore, we can review those issues at this interlocutory stage only if we exercise pendent appellate jurisdiction.

We decline to exercise pendent appellate jurisdiction over these two issues because (1) they are not "inextricably intertwined" with the district court's denial of sovereign immunity, and (2) a review of these issues is not "necessary to ensure meaningful review" of the denial of sovereign immunity. *See Swint*, 514 U.S. at 51. "This circuit has interpreted 'inextricably intertwined' to mean that the resolution of the appealable issue 'necessarily and unavoidably' decides the nonappealable issue." *Summers v. Leis*, 368 F.3d 881, 889 (6th Cir. 2004) (quoting *Vakilian v. Shaw*, 335 F.3d 509, 521 (6th Cir. 2003)); *see O'Bryan*, 556 F.3d at 377 n.7 (exercising pendent appellate jurisdiction because the non-reviewable issue turned on the same determination of whether a Foreign Sovereign Immunities Act exception applied); *Davenport v. Causey*, 521 F.3d 544, 554 (6th Cir. 2008) (finding that the issue of municipal liability was inextricably intertwined with a qualified-immunity determination because the municipality could be liable only if its employees committed a constitutional violation). *But see Mich. Bell Tel. Co. v. Climax Tel. Co.*, 202 F.3d 862, 867 (6th Cir. 2000) (exercising pendent appellate jurisdiction because "it would be a waste of judicial resources not to hear the other claims now" even though "the Eleventh Amendment claim can be resolved without resolving either of the other claims"). Whether HCJFS is an arm of the state has no bearing on the merits of the other issues raised by HCJFS, and we can meaningfully review HCJFS's claim of sovereign immunity without addressing these issues. Therefore, we do not exercise pendent appellate jurisdiction over these issues and decline to address them further on appeal. *See Brotherton v. Cleveland*, 173 F.3d 552, 568 (6th Cir. 1999) (declining to exercise pendent appellate jurisdiction over issue of liability when reviewing denial of Eleventh Amendment sovereign immunity).

**B.  Standard of Review**

"Whether an action is barred by the Eleventh Amendment is a question of law, and is reviewed *de novo*." *Barton v. Summers*, 293 F.3d 944, 948 (6th Cir. 2002) (citing *Timmer v. Mich. Dep't of Commerce*, 104 F.3d 833, 836 (6th Cir. 1997)).  However, we "accept any pertinent factual findings by the district court unless they are clearly erroneous." *S.J. v. Hamilton County, Ohio*, 374 F.3d 416, 418 (6th Cir. 2004) (citing *Keller*, 277 F.3d at 815). "[T]he entity asserting Eleventh Amendment immunity has the burden to show that it is entitled to immunity, *i.e.*, that it is an arm of the state." *Gragg v. Ky. Cabinet for Workforce Dev.*, 289 F.3d 958, 963 (6th Cir. 2002).

**C.  Eleventh Amendment Sovereign Immunity**

The desire to protect the solvency and dignity of the states motivates the doctrine of Eleventh Amendment sovereign immunity. *See Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 52 (1994); *Ernst v. Rising*, 427 F.3d 351, 364-65 (6th Cir. 2005) (en banc); *S.J.*, 374 F.3d at 421.  The doctrine "flows from the nature of sovereignty itself as well as the Tenth and Eleventh Amendments to the United States Constitution." *Ernst*, 427 F.3d at 358.  However, it "comes with a host of exceptions." *Id.*  One of the more prominent exceptions to the doctrine is that state instrumentalities that properly are characterized as political subdivisions, rather than arms of the state, are not entitled to sovereign immunity. *See id.* at 358-59.

Lowe's disability discrimination claims arise under Title I of the Americans with Disabilities Act ("ADA"), which prohibits certain employers from discriminating on the basis of disability. *See* 42 U.S.C. §§ 12111-12117.  States are immune to suits for money damages under Title I because Congress exceeded its Fourteenth Amendment enforcement powers in enacting those provisions and therefore did not properly abrogate the states' sovereign immunity from such suits. *Bd. of Trs. of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 374 (2001); *see also Robinson v. Univ. of Akron Sch. of Law*, 307 F.3d 409, 411 (6th Cir. 2002).  However, political subdivisions of the states are not entitled to sovereign immunity from such suits. *See Garrett*, 531 U.S. at 369 ("[T]he Eleventh Amendment does not extend its immunity to units of local government.  These entities are subject to private

claims for damages under the ADA without Congress' ever having to rely on § 5 of the Fourteenth Amendment to render them so." (citation omitted)).

Whether HCJFS is immune from suit thus turns on whether it is properly characterized as a political subdivision (and thus not immune) or an arm of the state (and thus immune). In order to make this determination, we must evaluate four factors: (1) the State of Ohio's potential legal liability for a judgment against HCJFS; (2) the language employed by state courts and state statutes to describe HCJFS, as well as the degree of control and veto power which the state has over HCJFS; (3) whether state or local officials appoint HCJFS board members; and (4) whether HCJFS's functions fall under the traditional purview of state or local government. *See Ernst*, 427 F.3d at 359 (citing *Hess*, 513 U.S. at 44-45, 51). We conclude that HCJFS has not met its burden to show that it is entitled to Eleventh Amendment sovereign immunity.

### 1.     *State's potential legal liability for judgment against the entity*

The state's potential legal liability for a judgment against the defendant "is the foremost factor" to consider in our sovereign immunity analysis. *Ernst*, 427 F.3d at 359. In analyzing this factor, we focus our inquiry on "the state treasury's *potential* legal liability for the judgment, not whether the state treasury will pay for the judgment in *that* case." *Id.* (citing *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 431 (1997)). HCJFS concedes that it will pay directly any judgment awarded to Lowe. However, it contends that the state will reimburse it for any such damages because Lowe's primary job duties were to help administer state and federal benefits programs and her wages were funded largely through a system of state and federal reimbursement. HCJFS argues that this factor weighs in its favor based on this reimbursement theory. This argument is unavailing in two regards. First, it misconstrues the relevant inquiry, which is whether the state is potentially legally liable for a judgment against the entity seeking immunity, not whether the state or another party is obligated to reimburse or indemnify the entity for damages incurred. Second, even if we were to accept HCJFS's reimbursement theory as determinative, HCJFS has not met its burden to show that the state necessarily will reimburse it for damages awarded to Lowe. Thus, this factor weighs against a finding that HCJFS is an arm of the state.

HCJFS's argument misses the analytic focus of this factor, which is the state's potential legal liability for a judgment against the entity, not the state's willingness or obligation to reimburse the entity for damages paid as a result of the judgment. HCJFS concedes that it would pay directly any judgment awarded to Lowe, so its entire argument rests on a reimbursement theory. However, this line of argument is foreclosed by the Supreme Court's analysis in *Doe*. There, an employee brought a breach-of-contract claim against the University of California, alleging that the university reneged on its promise to hire him to work at the Lawrence Livermore National Laboratory, which the university operated pursuant to a contract with the federal government. *Doe*, 519 U.S. at 426-27. The Ninth Circuit denied the university Eleventh Amendment sovereign immunity because, under that contract, the federal government had indemnified the university from paying any damages that would have resulted from the suit. *Id.* at 427-28. The Supreme Court reversed, emphasizing that it was a state's "legal liability for judgments against a state agency" that was the important consideration, not "the presence or absence of a third party's undertaking to indemnify the agency." *Id.* at 430-31. Likening the federal government's reimbursement of the university's damages to liability insurance purchased by the university, the Court found that "it is the entity's potential legal liability, rather than its ability or inability to require a third party to reimburse it, or to discharge the liability in the first instance, that is relevant." *Id.* at 431.

The Court's determination that potential reimbursement from a third party was irrelevant to its sovereign immunity analysis cut in favor of granting sovereign immunity in *Doe*, but it cuts against HCJFS here. In *Doe*, the judgment would have been directly enforceable against the state, and the Court held that reimbursement by the federal government did not change the fact that the state was the entity which was legally liable for damages. Here, any judgment will be enforceable only against HCJFS, not the State of Ohio. Consistent with *Doe*, that the state may reimburse HCJFS for these damages does not change the fact that HCJFS is the party legally liable for the judgment. The question of legal liability is paramount because it is "an indicator of the relationship" between the state and the entity asserting sovereign immunity. *Id.* Indeed, the *Doe* Court warned against

"convert[ing] the inquiry into a formalistic question of ultimate financial liability."[1]  *Id.* Because HCJFS is the entity that will pay directly any judgment awarded to Lowe, this factor weighs against a finding that HCJFS enjoys state sovereign immunity.[2]  *See S.J.*, 374 F.3d at 422 (denying single-county juvenile-training facility sovereign immunity and noting that because county, not state, would directly pay judgment against the entity, "this 'important' factor weighs against sovereign immunity").

Further, even if we accepted HCJFS's reimbursement argument, HCJFS has not carried its burden to show that the state actually will reimburse it for damages awarded to Lowe.  HCJFS's argument rests heavily on the fact that Lowe's job duties related to the administration of state and federal public benefits programs.  Based on this, HCJFS contends that the state statutes related to the provision of these benefits require the state to reimburse it for any damages awarded to Lowe, and points to two statutes in particular.

Despite HCJFS's strong assertions, however, it has not pointed to anything that demonstrates conclusively that a judgment in an employment discrimination suit would be reimbursable as either an administrative expense or public assistance expenditure under the Ohio statutory scheme.  HCJFS relies chiefly on two statutes to support its

---

[1]We believe that the concurring opinion, like HCJFS, fails to heed this warning.  As the Third Circuit has stated, "*Doe* makes clear[] [that] the state's potential legal liability is the 'key factor' under this prong of analysis and 'merits far greater weight' than [the] practical consequences" of who will bear the ultimate financial responsibility for a lawsuit.  *Cooper v. Se. Penn. Transp. Auth.*, 548 F.3d 296, 306 (3d Cir. 2008) (quoting *Febres v. Camden Bd. of Educ.*, 445 F.3d 227, 236 (3d Cir. 2006)).  Moreover, as the concurring opinion seems to agree, HCJFS fails even to show that the state would bear financial liability for a judgment at some point further down the road.

[2]In fact, a closer examination of *Cash v. Granville County Board of Education*, 242 F.3d 219 (4th Cir. 2001), cited by the concurring opinion for its analysis of *Doe*, is illustrative.  In that case, the Fourth Circuit held that a county board of education was not entitled to sovereign immunity in a Fair Labor Standards Act lawsuit brought by one of its employees, in large part because "the State would not be legally obligated to pay any judgment rendered against" the board.  *Id.* at 224.  In reaching this conclusion, the court relied on the fact that "no State law indicates that a judgment against [the board] can be enforced against the State," and although the board received state funds, it was "unable to identify a provision in State law that would authorize it . . . to use[] [those funds] for the purposes of satisfying an adverse judgment."  *Id.*  Moreover, the court determined that the possibility that the state would pay for an increase in the plaintiff's salary based on a judgment against the board was not dispositive.  *Id.* at 225.  Like the board in *Cash*, HCJFS has demonstrated, at best, only a "speculative, indirect, and ancillary impact" on the state's treasury.  *Id.*  That the state provides funding for Lowe's position does not change the fact that a judgment against HCJFS would not be enforceable against the state.

argument.  First, HCJFS directs us to a statute which vests the authority to establish eligibility for medical assistance programs in county job and family services departments.  *See* Ohio Rev. Code § 5111.012.  This statute also establishes that "[t]he county shall be reimbursed for administrative expenditures" and "[e]xpenditures for medical assistance shall be made from funds appropriated to the department of job and family services for public assistance subsidies."  *Id.*

However, this reimbursement provision is subject to several other statutory provisions that HCJFS fails to address and which undermine its position.  For example, HCJFS's claim that these programs are funded fully by federal and state monies is undermined by a provision specifically providing for county contributions for these public benefits programs.  *See id.* § 5101.16(B).  Similarly, its claim that the state would be obligated to reimburse it is undermined by a provision providing a mechanism for the state to reject reimbursement claims that exceed a predetermined maximum amount.  *See id.* § 5101.161.  HCJFS next cites to a statute that states that "[a]ll moneys received by each county from the state, or from the federal government" for public benefits programs "shall be considered appropriated for the purposes for which such moneys were received."  *Id.* § 329.09.  However, nothing in this statute indicates that such funds could be used by HCJFS for damages paid in an employment discrimination suit.  Indeed, HCJFS has provided no factual or statutory support for its contention that damages paid to Lowe would qualify as either administrative expenses or public benefits expenditures.[3]  Thus, even if we were to accept the flawed reimbursement argument, HCJFS still would have failed to carry its burden on this factor.[4]

---

[3]In its opening brief, HCJFS relied on its assertion that Lowe's only claim for relief was for back wages, and thus argued that HCJFS could request reimbursement for the damages coded as wages. However, it conceded in its reply brief that if Lowe is successful on her claims, she may be entitled to other types of damages.

[4]We do not share the concurring opinion's concerns about this statutory analysis.  Indeed, under *Doe*, such considerations are tangential to our analysis.  *See Cooper*, 548 F.3d at 303-04 (noting that *Doe* requires courts to focus on a state's potential legal liability for a judgment, such that a showing that an entity received the vast majority of its funding from the state would not necessarily weigh in favor of an immunity finding).  We cite to these statutes simply to refute HCJFS's argument that any damages awarded to Lowe would be reimbursed by the state as a matter of course under the statutory scheme.

Indeed, in cases where a state instrumentality has been found to be entitled to sovereign immunity based on state liability for a judgment, much more concrete evidence of liability has been provided. In *Ernst*, where a group of state-court judges sued a state retirement system set up for judges and other statewide officials, this Court found that Michigan would be liable for a judgment against the retirement system because of a state statute that required the legislature to fund the retirement system with "'the amount [of money needed] . . . to reconcile the estimated appropriation made in the previous fiscal year with the actual appropriation needed to adequately fund the retirement system for the previous fiscal year.'" *Ernst*, 427 F.3d at 360 (alterations in original) (quoting Mich. Comp. Laws § 38.2302(1)). The state constitution also treated this duty as a "'contractual obligation' owed by the State to each retiree." *Id.* (quoting Mich. Const. Art. 9, § 24). In *Holmes v. Marion County Office of Family & Children*, 349 F.3d 914 (7th Cir. 2003), an employment-discrimination case cited favorably by HCJFS, the Seventh Circuit held that an Indiana county social-services office was part of state government, rather than local government, and therefore entitled to state sovereign immunity. *Id.* at 918-19. But in doing so, the court relied on state statutes that excepted personnel and administrative costs from the definition of "child services" and required all personnel and administrative costs for such offices to "come exclusively from the state treasury." *Id.* at 919. (The court also relied on a state supreme court case that held that such offices were arms of the state. *See id.* at 918-19.) In contrast, HCJFS has not demonstrated that Ohio's "state treasury would be subject to 'potential legal liability' *if* [HCJFS] did not have the money to cover the judgment." *Ernst*, 427 F.3d at 362 (quoting *Doe*, 519 U.S. at 431).[5]

---

[5]We respectfully disagree with the concurring opinion's suggestion that this analysis runs afoul of our holding in *Ernst*. Contrary to the concurring opinion's assertion, this case does not involve "a statutorily-mandated indemnification agreement." Rather, it deals with a statutory scheme that permits HCJFS to be reimbursed by the state for a portion of its expenses. This scheme is clearly distinguishable from the statutory scheme considered in *Ernst*. There, a state statute and a provision of the state constitution specifically required state treasury funds to be used to make up any financial shortcoming that the retirement system encountered. *See Ernst*, 427 F.3d at 360. Thus, if the retirement system could not satisfy a judgment against it with its own funds, "it is clear . . . that the state treasury would have to pay the bill." *Ernst*, 427 F.3d at 360. In other words, the state was legally liable for a judgment in the event that the retirement system was unable to pay. In contrast, the statutory scheme at issue in this case does not shift direct legal liability to the state, it simply provides a mechanism for HCJFS to be reimbursed by the state for a portion of its expenses—and HCJFS fails even to show that any damages paid to Lowe

HCJFS has not met its burden to show that the state is potentially legally liable for a judgment against it, the foremost factor in determining whether it is entitled to Eleventh Amendment sovereign immunity.  Furthermore, as discussed below, the other three factors we must consider similarly weigh against finding that HCJFS is an arm of the state.

2.          *Language referencing the entity and degree of state control over the entity*

This factor also weighs against HCJFS because county job and family services departments are referred to and treated as local entities in Ohio statutes and case law and are controlled primarily by county boards of commissioners.  In arguing that this factor weighs in its favor, HCJFS again focuses on the fact that the substance of Lowe's job duties dealt with state and federal statutes and regulations.  However, HCJFS has not demonstrated how this  translates into state control of HCJFS.  Indeed, HCJFS concedes that Hamilton County controlled the time and place of Lowe's work and a page from HCJFS's own website in the record refers to HCJFS as a department of Hamilton County government.  Even more importantly, Ohio statutes and case law consistently refer to and treat county job and family services departments as local bodies and do not demonstrate "extensive and detailed control" of these departments by the state.  *Ernst*, 427 F.3d at 360.

The statutory framework clearly demonstrates that HCJFS and other such departments are treated as local entities and are controlled primarily by county governments.  The statutes that establish and govern the county departments of job and family services fall under Title III of the Ohio legislative code, entitled "Counties."  *See* Ohio Rev. Code § 329.01-.051; *cf. Hutsell v. Sayre*, 5 F.3d 996, 999-1000 (6th Cir. 1993) (noting that the University of Kentucky was created under a chapter of the state legislative code entitled, in part, "State Universities and Colleges," in support of finding that university enjoyed sovereign immunity).  State law requires that "[i]n each county

would qualify for reimbursement.

there shall be a county department of job and family services," but grants the local board of county commissioners the authority to appoint the county director of job and family services. Ohio Rev. Code § 329.01. Although state law prescribes a range of duties to the county departments, "[t]he powers and duties of a county department of job and family services are, and shall be exercised and performed, under the control and direction of the board of county commissioners." *Id.* § 329.04(B).

> The county director [of job and family services] is given "full charge" of the department, "[u]nder the control and direction of the board of county commissioners." [Ohio Rev. Code §] 329.02. The county director is empowered, with the approval of the board of county commissioners, to appoint various assistants, superintendents, and employees and fix their compensation.

2004 Ohio Op. Att'y Gen. 2004-031, 2004 WL 1960137, at *5 (Ohio A.G. Aug. 25, 2004) (second alteration in original) (holding that a board of county commissioners can authorize the county department of job and family services to enter into contracts relating to its family services duties and workforce development activities). Indeed, the statutes establishing state funding of these county departments repeatedly reference the transfer of money directly to individual counties, rather than the departments themselves, which suggests that each of these entities is considered a part of the government of the county in which it operates. *See* Ohio Rev. Code § 329.09 ("[a]ll moneys received by each county from the state"); *id.* § 5111.012 ("[t]he county shall be reimbursed").

The fact that Ohio statutes refer to entities like HCJFS as part of county government strongly weighs against affording HCJFS sovereign immunity. Counties are quintessentially local bodies, not entitled to state sovereign immunity almost by definition. *See Doe*, 519 U.S. at 429 n.5 ("Ultimately, . . . the question whether a particular state agency has the same kind of independent status *as a county* or is instead an arm of the State . . . is a question of federal law." (emphasis added)). The Supreme Court "has repeatedly refused to extend sovereign immunity to counties. This is true even when . . . 'such entities exercise a 'slice of state power.'"" *N. Ins. Co. of N.Y. v. Chatham County, Ga.*, 547 U.S. 189, 193-94 (2006) (citations omitted) (quoting *Lake*

*Country Estates, Inc. v. Tahoe Reg'l Planning Agency*, 440 U.S. 391, 401 (1979)); *see also Garrett*, 531 U.S. at 369 ("[T]he Eleventh Amendment does not extend its immunity to units of local government."); *S.J.*, 374 F.3d at 419-20 (holding that sovereign immunity "'does not extend to counties and similar municipal corporations'" (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977))).

Moreover, in two different circumstances, the state supreme court has found that agencies like HCJFS should be treated as county, not state, agencies. In *Rankin v. Cuyahoga County Department of Children and Family Services*, 889 N.E.2d 521 (Ohio 2008), the plaintiff sued a county department, its director, and one of its employees after a child was sexually abused while in the department's custody. The state supreme court found that the department was entitled to governmental immunity under Ohio's political-subdivision immunity statute, not under the Eleventh Amendment. *Id.* at 526 (citing Ohio Rev. Code § 2744.02). The court specifically found that the department was a political subdivision. *Id.* at 524. The court also noted that "'[t]he manifest statutory purpose of [Ohio's political-subdivision immunity statute] is the preservation of the fiscal integrity of political subdivisions.'" *Id.* at 526 (first alteration in original) (quoting *Wilson v. Stark County Dep't of Human Servs.*, 639 N.E.2d 105, 108 (Ohio 1994)); *see also Brenner v. Cuyahoga County Dep't of Children & Family Servs.*, No. 91712, 2009 WL 713014, at *2 (Ohio Ct. App. Mar. 19, 2009) (applying *Rankin* to reverse denial of statutory governmental immunity). Indeed, HCJFS seems to fall squarely under the definition of "political subdivision" given in the immunity statute: "a municipal corporation, township, county, school district, or other body corporate and politic responsible for governmental activities in a geographic area smaller than that of the state." Ohio Rev. Code § 2744.01(F). Although county departments of job and family services are not contained in the list of political subdivisions included in the statute, *see id.*, that list is non-exhaustive and the statute includes in its list of "governmental functions" of political subdivisions "[t]he operation of a job and family services department or agency, including, but not limited to, the provision of assistance to aged and infirm persons and to persons who are indigent," *id.* § 2744.01(C)(2)(m).

Similarly, in *Crawford-Cole v. Lucas County Department of Job & Family Services*, 906 N.E.2d 409 (Ohio 2009), the state supreme court addressed conflicting deadlines for filing an appeal of an agency decision. The court ruled that a county department of job and family services was a county agency, and not a state agency, and thus the shorter deadline applicable to county agencies applied to the department. *Id.* at 412-14. In doing so, the court distinguished one statute that applied to entities considered "arms of 'the government of the state,'" *id.* at 414 (quoting Ohio Rev. Code § 119.01(A)(1)), and another statute that applied to "political subdivisions such as counties," *id.* (citing Ohio Rev. Code § 2506.01). The court determined that the "political subdivision" statute was the law applicable to the county department.

It is clear that Ohio law treats entities like HCJFS as local bodies, not arms of the state. Moreover, local officials exercise greater direct control over HCJFS than does the State of Ohio. Accordingly, this factor weighs against a finding that HCJFS is entitled to state sovereign immunity.

### 3. *Whether state or local officials appoint the entity's board members*

HCJFS concedes that its officials are appointed at the local level and that this factor therefore weighs against a finding that it is an arm of the state. Indeed, as noted above, state law specifically requires that the Hamilton County Board of County Commissioners appoint the HCJFS director. *See* Ohio Rev. Code § 329.01.

### 4. *Whether the entity's functions are within the traditional purview of state or local government*

Although HCJFS is responsible for administering state and federal programs, its basic function is to provide services to local residents. While this factor is the closest of the four, it also weighs against a finding that HCJFS is entitled to sovereign immunity.

HCJFS argues that it "stands as the state's agent with respect to Lowe's position" because Hamilton County is required by state law to establish a county department to carry out federal benefits programs. *See* Ohio Rev. Code § 329.04(A). But as Lowe

points out, HCJFS is required to distribute these benefits to local Hamilton County residents, not on a statewide basis. *See Alkire v. Irving*, 330 F.3d 802, 813 (6th Cir. 2003) (noting that "an assessment of whether the entity is concerned with state-wide or local issues" may be relevant). HCJFS argues that it acts as an arm of the state in administering these programs because Ohio has no state-wide distribution system for these benefits. However, this feature of the Ohio system actually cuts against HCJFS because it demonstrates that Ohio law treats the distribution of these benefits as a local function. Moreover, our analysis need not be limited to the HCJFS programs in which Lowe was involved.[6] Although Lowe's job duties dealt directly with federal and state benefits programs, HCJFS carries out many other functions, including child-support enforcement, child-protection services, workforce development, and child care. *See* Ohio Rev. Code § 329.04 (listing powers and duties applicable to county job and family services departments); *see also In re D.C.*, No. C-090466, 2009 WL 3400930 (Ohio Ct. App. Oct. 23, 2009) (slip opinion) (demonstrating that HCJFS acts as a permanent custodian for children); *State v. Ellison*, 900 N.E.2d 228, 229 (Ohio Ct. App. 2008) (demonstrating that HCJFS investigates claims of child abuse).

HCJFS's functions cannot be characterized neatly as completely within the traditional purview of either local or state government. *Cf. Hess*, 513 U.S. at 45 (finding that because "[s]tates and municipalities alike" carried out the functions of the entity in question, "[t]his consideration . . . does not advance our Eleventh Amendment inquiry"). However, the fact that its programs are designed to serve a specific local community weighs against characterizing it as an arm of the state, rather than a political subdivision. *Cf. Ernst*, 427 F.3d at 361 (noting that both local and state governments operate retirement systems, but that the entity in question had "far more in common with a traditional state function than a local one" because it was operated through the state treasury, operated on a statewide basis, and served statewide officials).

---

[6]In *Doe*, the Supreme Court specifically declined "to decide whether there may be some state instrumentalities that qualify as 'arms of the State' for some purposes but not others." *Doe*, 519 U.S. at 427 n.2.

Moreover, because the other three relevant factors decidedly weigh against HCJFS, it is clear that HCJFS is properly characterized as a political subdivision, rather than as an arm of the state. Therefore HCJFS is not entitled to Eleventh Amendment sovereign immunity from Lowe's claims.

### III.  CONCLUSION

Based on the foregoing reasons, we **AFFIRM** the district court's denial of summary judgment as requested by HCJFS.

————————————————————————————————

**CONCURRING WITH THE JUDGMENT**

————————————————————————————————

SUHRHEINRICH, Circuit Judge, concurring.   Although I concur with the judgment, I cannot join the majority's reasoning for three reasons: (1) its extension of *Regents of the University of California v. Doe*, 519 U.S. 425 (1997), (2) its focus on Ohio Rev. Code § 5101.16, and (3) its reliance on Ohio Rev. Code § 5101.161.

First, I have substantive concerns with applying and extending *Doe* to this case. Unlike *Doe*, which involved extinguishing a state's immunity because of a voluntary third-party indemnification agreement, this case involves exposing the state to liability via a statutorily-mandated indemnification agreement.  *See generally Cash v. Granville County Bd. of Educ.*, 242 F.3d 219, 221 n.1 (4th Cir. 2001) ("And in *Regents*, the Court held that the fact that a judgment against the State would be covered by the voluntary indemnification agreement of a third party did not strip away the State's Eleventh Amendment immunity because the State still bore the legal 'risk of an [sic] adverse judgment.'")  (quoting *Doe*, 519 U.S. at 431).  Rather than focus on the method of payment, the majority should have focused on whether a judgment "'would have the practical effect of *requiring* payments from [Ohio].'" *McGinty v. New York*, 251 F.3d 84, 99 (2d Cir. 2001) (quoting *Mancuso v. N.Y. State Thruway Auth.*, 86 F.3d 289, 296 (2d Cir. 1996) (emphasis added).  Using this approach, if "the vulnerability of the State's purse is the most salient factor'" then it makes little difference to the state if it pays for a judgment directly or is statutorily required to reimburse the Hamilton County Department of Job & Family Services ("HCJFS") for the same amount.  *Id.* at 100 (quoting *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 48 (1994)).  Either way the state is required by law to distribute money from its treasury.

 Extending *Doe* to the case at hand is unsupported by any case law, and at least one district court has rejected the majority's interpretation of *Doe*.  *See Treasurer of State of Conn. v. Fortsmann Little & Co.*, No. 3:02CV519(JBA), 2002 WL 31455245,

at *5 (D. Conn. Oct 15, 2002). Even the Court's opinion in *Doe* itself suggests that its holding was not intended to be employed this broadly: "The *narrow* question presented by this case is whether the fact that the Federal Government has agreed to indemnify a state instrumentality against the costs of litigation, including adverse judgments, divests the state agency of Eleventh Amendment immunity. We hold that it does not." *Doe*, 519 U.S. at 426 (emphasis added); *see also Kirchmann v. Lake Elsinore Unified Sch. Dist.*, 100 Cal. Rptr. 2d 289, 298 (Cal. Ct. App. 2000) (emphasizing *Doe's* reference to the question presented as "'narrow'" and concluding that "*Doe* thus stands merely for the proposition that the fact state funds are *not* actually used to pay a judgment for which the state *is* legally liable does not *preclude* immunity"). Similarly, this application of *Doe* conflicts with our decision in *Ernst v. Rising*, 427 F.3d 351, 355 (6th Cir. 2005) (en banc). In *Ernst*, we noted: "[The retirement system] is funded by the state treasury as well as by contributions from state officials. And if the retirement system faces a monetary shortfall, *state legislation requires* the state treasurer to make up the difference with state funds." *Id.* (emphasis added). Likewise, in this case "state legislation requires" the state to reimburse HCJFS if the lawsuit is an administrative cost. *Id.* The majority neither explains how the reimbursement relationship in *Ernst* is any different than the one in this case, nor cites a single case to support its interpretation of *Doe*, despite the fact that it has been law for over a decade.

From a practical standpoint, I am concerned that expanding *Doe* will have unintended consequences regarding the way states structure their financial relationships with other state entities because we do not know how many state entities have similar payment relationships. This concern is compounded by the fact that the state is not a party in this suit and thus has not had a chance to weigh in on this issue. Notably, the majority opinion explicitly acknowledges that it does need to use *Doe* to reach its result: "even if we were to accept HCJFS's reimbursement theory as determinative, HCJFS has not met its burden to show that the state necessarily will reimburse it for the damages awarded to Lowe."

Second, the majority's focus on Ohio Rev. Code § 5101.16 is misguided. This section establishes that the county must pay for a portion of HCJFS's costs that are submitted for reimbursement, but the potential amount that must be paid appears to be no more than 10%, depending on certain financial criteria such as the income level of the county's constituents. The majority cites no case law to support the conclusion that an entity must be "fully funded" to be an arm of the state, rather than receiving 90% of its funds from the state. On the contrary, persuasive authority indicates this factor is not relevant. *See Hadley v. N. Ark. Cmty. Technical Coll.*, 76 F.3d 1437, 1440-41 (8th Cir. 1996) ("The relevant funding inquiry cannot be whether NACTC enjoys some non-state funding, such as user fees (tuition), because then most state departments and agencies, and all state universities, would be denied Eleventh Amendment immunity."). Furthermore, it is unclear why being "fully funded" is determinative since, depending on the judgment amounts, Ohio's treasury can be more financially exposed even if it has to pay a lower percentage of the overall judgment.

Third, I am concerned about the majority's reliance on Ohio Rev. Code § 5101.161, which may establish a threshold above which the state can deny reimbursement. The record reveals little about HCJFS's reimbursement relationship with the state, and the majority has not established that this threshold exists in a material way, that it is enforced, that HCJFS would be in danger of surpassing this threshold if it loses this case, or that the state would not reimburse HCJFS if it surpassed the threshold because of a damages award in this case or for another reason. These factors indicate that HCJFS has failed to meet its burden of proof on this issue, but § 5101.161 itself should not preclude HCJFS from obtaining immunity without more information about how the state enforces the statute or some case law supporting the majority's conclusion. *See generally Hadley*, 76 F.3d at 1441 ("The district's *never-exercised authority* to supplement NACTC's operating budget with limited local tax revenues does not change the fact that the State has created an institution of higher learning 'that is dependent upon and functionally integrated with the state treasury.'") (quoting *Kashani v. Purdue Univ.*, 813 F.2d 843, 846 (7th Cir. 1987) (emphasis added)).

Instead, the opinion should have focused on its conclusion that HCJFS failed to meet its burden of proof regarding whether the damages would be reimbursable as an administrative cost. HCJFS has not put forward sufficient evidence that the state would reimburse any litigation costs, let alone the costs that would be imposed if the plaintiff prevails in this case. By narrowly disposing of this case on the issue of what constitutes an administrative cost, this court could have avoided the unnecessary risk of sweeping too broadly with its interpretation of *Doe*, § 5101.161, and § 5101.16.